*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF FAMILY & COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) ) Supreme Court No. S-17943 |
| | ) Superior Court No. 4FA-17-02856 CI |
| Appellant, | ) O P I N I O N |
| v. | ) No. 7685 – February 9, 2024 |
| BRETT LANE, | ) |
| Appellee. | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellant. Michael C. Kramer, Kramer and Associates, Fairbanks, and Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, and Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

WINFREE, Chief Justice.
CARNEY, Justice, dissenting in part.

## I.    INTRODUCTION

A former Office of Children's Services (OCS) employee sued OCS, alleging that it had wrongfully retaliated against her and forced her resignation because

she had reported systemic failures to protect her from a dangerous client. A jury found OCS liable for retaliation and wrongful termination and awarded the former employee about $2.3 million in economic and noneconomic damages.

OCS appeals from the superior court's denial of its post-trial motion for the grant of a new trial or for an amendment to the judgment. As to its request for a new trial on liability: OCS argues that the court erroneously allowed the employee to raise an impermissible legal theory at trial, erroneously applied a subjective standard — rather than an objective standard — to review whether the weight of the evidence justified the liability verdict, and ultimately abused its discretion by denying the motion. As to its request for a new trial on damages: OCS argues that the court erroneously instructed the jury on how to limit the former employee's recovery to only those damages caused by OCS and not to any damages caused by OCS's client, and that the error was not harmless. As to its request for an amendment to the judgment: OCS argues that the court erroneously failed to reduce the judgment to account for the former employee's workers' compensation benefits duplicated by the jury's damages award.

We affirm the superior court's denial of OCS's post-trial motion for a new trial as to liability. We conclude, due to an erroneous jury instruction that cannot be considered harmless, that it was error not to grant a new trial on noneconomic damages due the employee from OCS. We also conclude that the record developed at trial is inadequate to review OCS's claim that the jury award duplicated amounts the former employee received in workers' compensation benefits, and that OCS should be allowed the opportunity for an evidentiary hearing to present its position. We therefore vacate the damages judgment and remand for further proceedings on these two damages issues.

## II. FACTS AND PROCEEDINGS

### A. Factual Overview[1]

Brett Lane began working as an OCS caseworker in June 2012. In ascending order of authority, Lane's supervisors were her immediate supervisor, Nicole Schok; the staff manager, Mindy Swisher; the Northern Region Manager, Coleen Turner; and the statewide Division Operations Manager, Travis Erickson.

In 2015 Lane was assigned to work with a father, referred to by the parties with the pseudonym of Wilson, who was known to be uncooperative. Wilson called OCS incessantly and left vulgar and threatening messages for Lane and others. Wilson's calls stopped after Schok contacted the police and she and a police officer spoke to Wilson. Lane asked her supervisors to file an OCS incident report about the calls. Turner filed a report five months after the calls were made.

In October 2016 Lane was supervising a visit between Wilson and his children when he became belligerent and slapped Lane's hand away from the children. Lane directed the front desk to call the police; Wilson left the visit. Turner directed the front desk not to make the call because she believed police assistance was unnecessary. At a later meeting to discuss the incident, Schok supported Lane and said Lane needed to be able to call the police at her discretion. Lane, Schok, and Turner developed an informal policy under which Lane would warn Wilson to behave properly, would ask Wilson to leave if he did not comply, and, if he refused to leave, would direct the front desk to call the police.

At a December 2016 visit Wilson slammed a visitation room door shut. When Lane opened the door to remind him it was to remain open, he shut the door on

---

[1] We set out the facts presented at trial in the light most favorable to upholding the jury's liability verdict. *Luther v. Lander*, 373 P.3d 495, 500 (Alaska 2016) (stating that when reviewing trial court's denial of motion for new trial we view facts in light most favorable to nonmoving party).

her leg. Lane directed the front desk to call the police. But Turner came out of her office, told the front desk not to call the police, directed Lane to return to her office, and allowed Wilson to finish the visit under Turner's own supervision. Another OCS employee then helped Lane file a police report and an OCS incident report. A meeting was held later that day with Erickson, who happened to be in Fairbanks, and Turner, Swisher, and Lane. Erickson confirmed that OCS policy authorized Lane to call the police any time violence occurred.

Lane was upset by her perceived lack of support from supervisors other than Schok, and Lane contacted her union; the union made a report to the Alaska Occupational Safety and Health Agency (AKOSH). AKOSH cited OCS for workplace safety failures and OCS agreed to commit more funding for employee safety.

In the month following Wilson's second assault on Lane, that family's case was transferred to another OCS worker, and Lane took a mixture of planned leave and unplanned leave for which she received workers' compensation benefits.[2] During

---

[2] The record for this appeal is scant on details of Lane's workers' compensation claim. In February 2017 she reported an occupational injury arising from Wilson's physical assault in December 2016, transmitting a physician's letter stating that she was being treated for acute anxiety due to the incident. Lane's workers' compensation claim remained unresolved at the time of trial and included claims for medical, disability, and re-employment benefits. The workers' compensation claim had ramifications for the litigation, first regarding allowable legal theories, allowable trial evidence, and appropriate jury instructions about damages, and second regarding post-trial considerations of the jury's damages award.

First, under the Alaska Workers' Compensation Act an employee is entitled to benefits for employment-related injuries without regard to fault by the employer. AS 23.30.045(b). In return, those benefits are, with rare exceptions, the exclusive remedy available to the employee from the employer. AS 23.30.055. The Act thus barred Lane from suing OCS for damages arising from Wilson's conduct, as well as for any related negligence claims that might otherwise have been brought against OCS in connection with Wilson's conduct. One exception to the bar to injury-related suits against an employer exists when an employer acts with intent to injure an

this time Lane suffered nightmares involving both Wilson and Turner, was diagnosed with post-traumatic stress disorder (PTSD), and shifted her focus in personal counseling to her fears of inadequate workplace safety.

In March 2017 Lane returned to work full time. On her first day back, she and a coworker were informed that they needed to remain in their offices with the doors closed, not chat with each other, and focus on paperwork for the next two weeks. They were said to be on "protected time," in which a worker is isolated from distractions to focus on paperwork. Lane testified that because her cases still were being handled by other workers, she primarily sat in her office with nothing to do. After two weeks Lane's mental condition deteriorated, and her doctor ordered her to work only half days. Lane's full caseload then was returned to her.

Lane then began believing she was receiving unjustified negative feedback about her work performance. Schok's direct supervisor, Swisher, viewed Lane as "meeting the standard as a caseworker" but wanted to include negative comments about Lane's work in a pending performance review. Schok disagreed with many of Swisher's negative comments and refused to include some of them.

In May 2017 Lane was subpoenaed to testify at a hearing regarding Wilson's children. Schok gave Lane permission to review the case file to prepare for

---

employee. *See, e.g.*, *Williams v. Mammoth of Alaska, Inc.*, 890 P.2d 581, 585 (Alaska 1995). The Act likewise does not operate to bar suits against an employer for wrongful retaliation and related emotional distress. *See, e.g.*, *Reust v. Alaska Petroleum Contractors, Inc.*, 127 P.3d 807, 819-20 (Alaska 2005).

Second, as OCS pointed out to the superior court in its post-trial motion, the Act generally does not contemplate that an employee can obtain a double recovery of both workers' compensation benefits and common law damages for the same injury. We have held, for example, that "an employee is not entitled to recover lost wages in a breach of contract action for any period of time that the employee was disabled and received compensation benefits for the disability." *Cameron v. Beard*, 864 P.2d 538, 547 (Alaska 1993).

her testimony, but Turner responded to the subpoena with an email stating that Lane was not available to testify.

Around the same time, Lane requested permission to provide foster care for two children in OCS custody because she had a relationship with the family outside of her employment. OCS had a general policy against placing children with OCS workers. Turner denied the request and initiated an internal investigation into Lane's request, which cleared Lane of any wrongdoing.

Lane resigned shortly thereafter, effective in July 2017.

## B. Proceedings

Lane sued OCS for wrongful constructive termination, asserting both breach of contract and tortious breach of the covenant of good faith and fair dealing implied in every contract, retaliation in violation of the Alaska Whistleblower Act,[3] and intentional infliction of emotional distress (IIED). A jury trial was held in February 2020, and, as will be discussed further with respect to jury instructions, Lane dismissed her IIED claim during trial. The jury found in Lane's favor on her retaliation and wrongful constructive termination claims and awarded her about $2.3 million in total economic and noneconomic damages.

OCS filed a post-trial motion for a new trial on liability and damages or for an amendment of the judgment to reflect an offset for workers' compensation benefits paid to Lane, which the superior court denied. OCS appeals the superior court's denial of its post-trial motion.

## III. DISCUSSION

### A. We Affirm The Superior Court's Denial Of OCS's Motion For A New Trial As To Liability.

When denying OCS's post-trial motion, the superior court ruled that the weight of the evidence supported the jury's verdict on Lane's theories of retaliation.

---

[3]     *See* AS 39.90.100-.190.

We see no error or abuse of discretion in that ruling, and we affirm the superior court's order denying the motion as to OCS's liability to Lane.

1.    **Overview**

a.    **Relevant legal standards for Lane's claims**

Lane sued OCS for retaliation in violation of the Alaska Whistleblower Act and for constructive wrongful termination. Retaliation, even short of wrongful termination, is actionable under the Whistleblower Act,[4] and "[t]o bring suit under the Whistleblower Act 'an employee must show that (1) she has engaged in a protected activity and (2) the activity was a "substantial" or "motivating factor" in her termination.' "[5] Because Lane resigned and asserted that she was forced to resign as a result of the alleged retaliation, she also had to prove that she was constructively discharged.[6] "To prove constructive discharge, employees must show that reasonable persons in their position would have felt compelled to resign."[7]

"To prevail on a wrongful termination claim 'an employee must prove: (1) that the employee was discharged by [his or her] employer and (2) that the employer breached a contract or committed a tort in connection with the employee's

---

[4]    *See* AS 39.90.100(a) (prohibiting employer not only from discharging, but also from threatening or discriminating against protected employee "regarding the employee's compensation, terms, conditions, location, or privileges of employment").

[5]    *Okpik v. City of Barrow*, 230 P.3d 672, 678 (Alaska 2010) (quoting *Hammond v. State, Dep't of Transp. & Pub. Facilities*, 107 P.3d 871, 873 n.5 (Alaska 2005)).

[6]    *See City of Fairbanks v. Rice*, 20 P.3d 1097, 1102 (Alaska 2000).

[7]    *Id.* (citing *Cameron v. Beard*, 864 P.2d 538, 547 (Alaska 1993)).

termination.' "[8]  Constructive discharge can satisfy the first element.[9]  Breach of the implied covenant of good faith and fair dealing can satisfy the second element.[10]

> In *Lincoln v. Interior Regional Housing Authority* we recognized:

> Retaliatory discharge can create a claim for breach of the covenant of good faith and fair dealing . . . . The elements of retaliatory discharge are similar to a Whistleblower Act violation, and this court has adopted the three-part test used in federal Title VII employment discrimination cases to define those elements.  A plaintiff must demonstrate that (1) she engaged in protected activity, (2) her employer subjected her to adverse employment action, and (3) there is a causal connection between her protected activity and the employer's action.[11]

### b.    Relevant legal standards for jury verdict review

As clarified in *Hunter v. Philip Morris USA Inc.*, the standard we use to review a denial of a motion for a new trial is different from the standard that trial courts use to consider a motion for a new trial.[12]  In *Hunter* we acknowledged that the standard

---

**8**      *Okpik*, 230 P.3d at 679 (alteration in original) (quoting *Charles v. Interior Reg'l Hous. Auth.*, 55 P.3d 57, 59 (Alaska 2002)).

**9**      *Id.* (citing *Rice*, 20 P.3d at 1102 n.7); *Rice*, 20 P.3d at 1102 n.7 ("Constructive discharge is not an independent cause of action, but merely satisfies the discharge element in a wrongful discharge claim.").

**10**     *Okpik*, 230 P.3d at 679 ("An employer may breach the covenant objectively or subjectively." (citing *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1034 (Alaska 2003))).  An employer objectively breaches the covenant when it "fails to act in a manner that a reasonable person would consider fair."  *Id.* (quoting *Witt*, 75 P.3d at 1034).  An employer subjectively breaches the covenant "when [the] employer is motivated by the goal of depriving the employee of a benefit of the contract."  *Witt*, 75 P.3d at 1034 (citing *Holland v. Union Oil Co. of Cal., Inc.*, 993 P.2d 1026, 1032 (Alaska 1999)).

**11**     30 P.3d 582, 586 (Alaska 2001).

**12**     364 P.3d 439, 447-49 (Alaska 2015).

set forth in *Kava v. American Honda Motor Co.*[13] is "the standard trial courts should use[,]"[14] reiterating that

> a trial court may set aside a verdict and order a new trial in the interest of justice if the verdict is against the weight of the evidence. In deciding a motion for a new trial on this basis, the court must use its discretion and independently weigh the evidence. A court may set aside a verdict as being against the weight of the evidence even when "there is substantial evidence to support it." The decision is a matter for the trial court's discretion.[15]

We further explained that "[a] trial court should continue to use its discretion to determine whether a verdict is against the weight of the evidence — not merely whether the trial court disagrees with the verdict — and whether a new trial is necessary 'in the interest of justice,' that is, 'to prevent injustice.' "[16]

> Our review on appeal is different; we look to whether
>
> the evidence to support the verdict is completely lacking or is so slight and unconvincing as to make the verdict plainly unreasonable and unjust. If there is an evidentiary basis for the jury's decision, denial of a new trial must be affirmed. We will not interfere with the trial court's discretion except in the most exceptional circumstances and to prevent a miscarriage of justice.[17]

---

[13]    48 P.3d 1170 (Alaska 2002).

[14]    *Hunter*, 364 P.3d at 447 (relying upon *Kava*, 48 P.3d at 1176).

[15]    *Id.* (quoting *Kava*, 48 P.3d at 1176).

[16]    *Id.* at 448 (first quoting *Kava*, 48 P.3d at 1176 and Alaska R. Civ. P. 59(a); and then quoting 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.13[1] (3d ed. 2015)); *see also id.* ("We commit this determination to trial courts' sound discretion based on our trust in their position, expertise, and humility. History has indicated this trust is well deserved.").

[17]    *Id.* at 449 (quoting *Mullen v. Christiansen*, 642 P.2d 1345, 1348 (Alaska 1982)).

We emphasized that "[t]he standard trial courts use to evaluate motions for new trials is much more dedicated to their discretion[]" while "[a]ppellate intervention is reserved for situations in which 'evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust.' "[18]

### 2. Lane's legal theories for liability

While not particularly clear from the briefing, OCS appears to be making two legal arguments about Lane's legal theories: (a) that Lane's claims should have been limited by the workers' compensation exclusive remedy provision and (b) that the superior court erred by denying OCS's pre-trial summary judgment motion as to Lane's IIED claim.

#### a. The superior court did not err by permitting Lane to proceed with her retaliation and discharge theories of liability.[19]

OCS argues that "[t]he superior court erred in not granting a new trial because Lane conflated retaliation with a failure to maintain a safe workplace in presenting her case." OCS argues that it "was held liable in tort for damages for events barred by the exclusivity of the worker's compensation remedy." In short, OCS claims "Lane was improperly permitted to invite the jury to hold OCS liable in tort for her injury arising out of its purportedly unsafe workplace — an injury for which Lane had received workers' compensation benefits and was seeking more." We disagree.

We recognize that AS 23.30.055 provides that "[t]he liability of an employer prescribed in AS 23.30.045 is exclusive and in place of all other liability of the employer . . . on account of the injury or death." And we acknowledge that the workers' compensation system is

---

[18] *Id.* at 449 (quoting *Ahlstrom v. Cummings*, 388 P.2d 261, 262 (Alaska 1964)).

[19] "We review legal questions de novo . . . ." *Lee v. Konrad*, 337 P.3d 510, 517 (Alaska 2014) (quoting *Est. of Smith v. Spinelli*, 216 P.3d 524, 528 (Alaska 2009)).

sometimes called the "grand bargain," in which workers give up their right to sue in tort for damages for a work-related injury or death in exchange for limited but certain benefits, and employers agree to pay the limited benefits regardless of their own fault in causing the injury or death.[20]

But it also is well established that there is a common law remedy for wrongful retaliatory discharge notwithstanding the workers' compensation system. OCS acknowledges this — citing to both *Kinzel v. Discovery Drilling, Inc.*[21] and *Reust v. Alaska Petroleum Contractors, Inc.*[22] — in its briefing. In *Kinzel* we stated:

> In *Reed v. Municipality of Anchorage* an employee alleged that he had been fired in retaliation for filing a job safety complaint. We held that the [relevant] whistleblower statute . . . does not confer a private cause of action, but that the employee had a common law remedy for his retaliatory discharge claim. He alleged that his termination for whistleblowing was a violation of the covenant of good faith and fair dealing that is implied in employment contracts. We agreed.[23]

---

**20** *Burke v. Raven Elec., Inc.*, 420 P.3d 1196, 1202 (Alaska 2018) (first quoting *Baker v. Bridgestone/Firestone*, 872 N.W.2d 672, 676 (Iowa 2015); and then citing *Taylor v. Se.-Harrison W. Corp.*, 694 P.2d 1160, 1162 (Alaska 1985)).

**21** 93 P.3d 427, 438 (Alaska 2004) (recognizing common law remedy for retaliatory discharge).

**22** 127 P.3d 807, 819-20 (Alaska 2005) (acknowledging emotional distress damages in wrongful discharge cases are not preempted by workers' compensation exclusive remedy provision).

**23** *Kinzel*, 93 P.3d at 437; *id.* at 438 ("In the present case violations of explicit public policies — protection of whistleblowers who file safety complaints or workers who file workers' compensation claims — are alleged. In these circumstances we believe that it is appropriate to allow a tort remedy to more effectively deter prohibited conduct. We thus join the numerous authorities that have so ruled." (citations omitted)).

And in *Reust* we analyzed whether a related "claim for emotional distress damages was preempted by the Alaska Workers' Compensation Act."[24] We concluded that it was not, acknowledging that

> we have held that the "socially beneficial purpose of the workers' compensation law would not be furthered by allowing a person who commits an intentional tort to use the compensation law as a shield against liability." Likewise, it would be nonsensical to allow an employer to rely on the exclusive remedy section, AS 23.30.055, to preclude damages stemming from a public policy violation.[25]

While we review this legal issue de novo, we nonetheless agree with and reiterate the superior court's rejection of OCS's contentions relating to this point:

> OCS does not get to define Ms. Lane's claim. Ms. Lane has consistently charged that it was OCS's handling of Mr. [Wilson] and treatment of her, and not Mr. [Wilson]'s threats or assaults against her, that form [the] basis for her claims. Moreover, Ms. Lane's claims concern OCS's treatment of Ms. Lane in 2017, long after Ms. Lane stopped working with Mr. [Wilson], and Ms. Lane has made clear that it was the actions of OCS that caused her damages and form the basis of her claim.

Indeed, the jury instructions clearly support that the jury was charged with determining the merits of Lane's retaliation-based theories. For example, one instruction provides:

> The plaintiff in this case claims that the defendant unlawfully retaliated against her in violation of the Alaska Whistleblower Act when she made workplace safety complaints to her employer and/or additional requests to the police, to her Union, to Alaska Occupational Safety and Health, and to the Alaska Worker's Compensation Board. The plaintiff in this case also claims that the defendant

---

**24** 127 P.3d at 819.

**25** *Id.* at 819-20 (quoting *Fenner v. Municipality of Anchorage*, 53 P.3d 573, 575 (Alaska 2002)).

> wrongfully terminated her from her position of employment
> with the defendant by constructively discharging her from
> her employment and by breaching the implied promise of
> good faith and fair dealing with regards to her employment
> contract with the defendant.

And other instructions set forth the elements required to "show retaliation under the Whistleblower Act" and to show Lane "was wrongfully terminated from her employment with the defendant."

We conclude that Lane's wrongful retaliation and discharge claims were not barred by the exclusive remedy of the workers' compensation system, that the evidence presented at trial about Wilson's actions did not taint those claims, and that the superior court did not err by permitting Lane to proceed on those claims.

### b. We decline to review the order denying OCS's motion for summary judgment on Lane's IIED claim.

OCS argues that by "denying OCS's motion for summary judgment on Lane's IIED claim, the superior court wrongly inferred evidence of [OCS's] specific intent [to harm Lane] by sheer speculation — surmising that Turner violated the visit protocol in the hopes that Wilson would hurt Lane." But "[o]rders denying summary judgment on factual grounds are generally unreviewable on appeal after a trial on the merits; on the other hand, we have reviewed denials of summary judgment after a trial on the merits 'when the order was entered on a legal ground that affected the subsequent trial.' "[26] The denial of a "motion for summary judgment principally on the ground that there were disputed issues of fact . . . is precisely the type of challenge to a denial of summary judgment that we do not address after a trial on the merits."[27]

The superior court denied OCS's summary judgment motion after concluding that there was a reasonable evidentiary dispute on the elements of Lane's

---

[26] *Greene v. Tinker*, 332 P.3d 21, 32 (Alaska 2014) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 133 n.66 (Alaska 2014)).

[27] *Id.* (citing *ConocoPhillips Alaska, Inc.*, 322 P.3d at 133 n.66).

IIED claim. Lane later dismissed her IIED claim during trial. Based upon the procedural posture and record before us, we see no basis for considering OCS's request to review the superior court's summary judgment denial.

### 3. The superior court's standard when considering the weight of the trial evidence[28]

OCS argues that when "denying a new trial, the superior court erroneously viewed OCS's actions subjectively, rather than objectively, and consequently wrongly concluded that the weight of the evidence demonstrated that OCS took adverse employment actions." OCS further argues that "[h]ad the court applied the correct objective test in considering a new trial, it would have recognized that Lane did not suffer actions materially adverse and motivated by retaliation." OCS's arguments are misguided.

We first note that the superior court gave the jury an unappealed jury instruction expressly stating the objective standard the jury was required to use on the constructive discharge question.[29] We see nothing to suggest that the superior court did

---

[28] *See Downing v. Shoreside Petroleum, Inc.*, 528 P.3d 874, 885 (Alaska 2023) ("Whether the trial court applied the correct legal standards in making its determination is a question we review de novo." (quoting *Sanders v. Sanders*, 902 P.2d 310, 313 (Alaska 1995))).

[29] The relevant instruction provides as follows:

> The defendant constructively discharged the plaintiff if you find that the following is more likely true than not true that: (1) The defendant through the defendant's officers, directors, managing agents, or supervisory employees intentionally created working conditions or knowingly permitted working conditions to exist that were so intolerable that a reasonable person in the plaintiff's position would have felt compelled to resign; and (2) That the plaintiff resigned because of these conditions.
>
> . . . .

not understand that the jury's verdict was based on an objective standard. We next note that the court articulated the correct legal standard for considering the new trial motion, stating that

> a trial court may set aside a verdict and order a new trial in the interest of justice if the verdict is against the weight of the evidence. In deciding a motion for a new trial on this basis, the court must use its discretion and independently weigh the evidence. A court may set aside a verdict as being against the weight of the evidence even when "there is substantial evidence to support it." The decision is a matter for the trial court's discretion.[30]

After correctly reciting the applicable standard — and recognizing that it "must use its discretion and independently weigh the evidence" — the court aptly summarized its later in-depth analysis by stating that "the court does not find that the jury's decision was against the weight of the evidence and therefore the court declines to grant a new trial." OCS's argument that the court somehow applied the wrong legal standard when reviewing the new trial motion is without merit.

### 4. The superior court's denial of OCS's motion for a new trial

We review the superior court's ultimate denial of OCS's new trial motion for abuse of discretion and "will not interfere with the trial court's discretion except in

---

> In determining whether an employer makes, or knowingly permits, working conditions so intolerable that the employee is forced into involuntary resignation, you must consider the evidence from the perspective of a reasonable person. This is an objective standard and requires you to look at the evidence from the perspective of a reasonable person's reaction to a similar environment under similar circumstances.

[30] *See supra* Section III.A.1.b. (discussing standard for trial courts' review of new trial motions based on the sufficiency and weight of the evidence).

the most exceptional circumstances and to prevent a miscarriage of justice."[31]  This is not one of those exceptional circumstances, nor is the evidence so completely lacking or slight and unconvincing.  Because the jury found for Lane on both her statutory and common law theories of liability, and "[t]he elements of retaliatory discharge are similar to a Whistleblower Act violation,"[32] the evidentiary review is coextensive; in its order the superior court reviewed in detail the evidence supporting the jury's verdict.

OCS concedes that Lane "engaged in protected activity under both laws by reporting safety issues and receiving workers' compensation benefits."  OCS nonetheless contends that (1) "[t]he evidence that OCS took adverse employment actions in retaliation for her activity was too 'slight and unconvincing' to support the verdict," and (2) "the evidence is too slight and unconvincing to support the necessary causal link between Lane's protected activity — contacting the police and safety investigators, and receiving workers' compensation benefits — and the purported adverse employment actions."  But viewed in Lane's favor, there is sufficient evidence supporting the jury's determination that OCS took adverse employment actions following her engaging in protected activity.[33]

The evidence can be reasonably viewed to indicate Turner was a vindictive upper-level manager who targeted Lane for her protected activity.  The evidence also can be reasonably viewed to indicate that mid- and lower-level managers were unwilling or unable to protect Lane from Turner's retaliation.  For example, Lane

---

[31]     *Hunter v. Phillip Morris USA Inc.*, 364 P.3d 439, 449 (Alaska 2015) (quoting *Mullen v. Christiansen*, 642 P.2d 1345, 1348 (Alaska 1982)).

[32]     *Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 586 (Alaska 2001).

[33]     *See* AS 39.90.100(a)(1) ("A public employer may not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because (1) the employee, or a person acting on behalf of the employee, *reports to a public body or is about to report to a public body a matter of public concern*[.]" (emphasis added)).

asked Turner to file an incident report after Wilson left threatening and vulgar messages for her, but Turner did not file the report until five months later. Turner had not even listened to the messages before trial, and, when the messages were played, she admitted that Wilson seemed to pose more of a threat than she initially had thought.

When Wilson first assaulted Lane by slapping her hand during a visit, Turner countermanded Lane's request that the receptionist call the police. When Wilson next assaulted Lane by slamming a door on her leg, Turner again countermanded Lane's request for the police. Evidence reflects that after the second assault, Lane went on a combination of planned and unplanned leave during which she received workers' compensation benefits relating to her work-related stress. As the superior court stated — about when Lane returned to work — it heard

> evidence that Ms. Lane was confined to her office, prohibited from communicating with her co-workers, refused access to her casefiles such that she could not do work; . . . [and later] was tasked with carrying a full caseload while only working part-time and was not assisted by Ms. Schok despite th[e] fact that Ms. Schok would assist other OCS caseworkers in managing their caseloads.

Although OCS argues that other employees offered Lane help, evidence can reasonably be seen to reflect that those coworkers had limited ability, if any, to directly monitor or control Turner's retaliatory actions. An OCS employee testified that when AKOSH came to investigate Lane's safety report, Turner "was pacing back and forth" outside that employee's office while she was being interviewed, not "being happy." The employee testified that she felt "very scared, just really nervous about . . . what I was allowed to talk about or what I should be talking about. If . . . there would be repercussions for anything that I would say."

Lane also presented witnesses who testified about a pattern of "targeting" in which Turner would single out employees and make them "feel fearful of their job or going to work." The worker who helped Lane report Wilson's second assault testified that Turner "pretty much told" her that Turner was targeting Lane and did not

want Lane working at that office. Turner herself testified to an incident involving another OCS employee in which she went on an expletive-laden rant describing herself as a "general" and Swisher as a "sergeant" and demanding that employees always "do what the general says."

The jury was instructed on a mixed-motive standard for causation and OCS does not appeal this instruction. Under the mixed-motive standard, even if OCS's actions were "not completely pretextual," Lane still could succeed by showing that they "were nonetheless substantially motivated by a desire for retaliation."[34] She "must at least offer . . . circumstantial evidence strong enough to be functionally equivalent to direct proof" of retaliatory intent.[35] Although OCS argues that its actions were taken for independent and legitimate reasons, the jury determined these justifications were either pretextual or the product of mixed motives. In light of the immediacy of Turner's actions in response to Lane's protected activities[36] and Turner's described pattern of targeting those whom she "did not want . . . working at the office," the superior court did not abuse its discretion when it determined that the circumstantial evidence was "akin to direct proof that Ms. Turner's actions were motivated by Ms. Lane's protected activities."

The record provides sufficient support for the jury's verdict that Lane was subject to adverse employment actions because she engaged in a protected activity. There is no basis to conclude that "the evidence to support the verdict is completely lacking or is so slight and unconvincing as to make the verdict plainly unreasonable and

---

[34]     *Mahan v. Arctic Catering, Inc.*, 133 P.3d 655, 662 (Alaska 2006).

[35]     *Id.* (citing *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 434 (Alaska 2004)).

[36]     *See id.* at 660 ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." (quoting *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 919 (Alaska 1999))).

unjust."[37] The superior court thus did not abuse its discretion by denying OCS's motion for a new trial as to liability.

**B.      We Vacate The Judgment As To Noneconomic Damages And Remand For A New Trial On That Issue Due To An Improper Jury Instruction.**

**1.      Relevant legal framework for reviewing jury instructions**

When a proper objection was raised in the trial court, we review de novo the correctness of jury instructions.[38] In *Cooper v. Thompson* we stated:

> "An instruction that sets out an incorrect or incomplete statement of the applicable law amounts to reversible error only if it causes substantial prejudice to a party — that is, only 'if it can be said that the verdict may have been different had the erroneous instruction not been given.' "  "We evaluate whether any error was prejudicial by putting ourselves in the position of the jurors and determining whether the error probably affected their judgment."[39]

We do not look narrowly at one disputed jury instruction when considering prejudice, but rather look at relevant jury instructions as a whole.[40]

**2.      The primary jury instructions**

The pathway to giving the challenged jury instruction, referred to below as Instruction B-10, was convoluted, and we describe it in some detail so the later post-trial motion (as it related to the disputed jury instruction) and the superior court's ruling

---

[37]      *Hunter v. Philip Morris USA Inc.*, 364 P.3d 439, 449 (Alaska 2015) (quoting *Mullen v. Christiansen*, 642 P.2d 1345, 1348 (Alaska 1982)).

[38]      *Cooper v. Thompson*, 353 P.3d 782, 786 (Alaska 2015).

[39]      *Id.* (first quoting *Parnell v. Peak Oilfield Serv. Co.*, 174 P.3d 757, 765 (Alaska 2007); and then quoting *Zamarello v. Reges*, 321 P.3d 387, 392 (Alaska 2014)).

[40]      *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015) (providing that when reviewing claims of error involving jury instructions, "our inquiry focuses upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law").

can be placed in context. OCS's and Lane's arguments to us, and our resolution of the dispute, then can be better understood.

The parties submitted proposed jury instructions and responsive objections, and the court then prepared preliminary draft instructions for discussion at a February 20, 2020 on-record session. The preliminary draft instructions are not in the record. The court handed out a new set of draft instructions on February 21, which were discussed that day and then again on February 24. This second set of draft instructions also is not in the record. But transcripts of the discussions reveal the parties' positions leading to further discussions on February 27 with a third set of draft instructions (apparently distributed February 26).

Late in the February 20 session one of Lane's attorneys raised a key issue: how to deal with Wilson not being a party to the lawsuit. The court recalled that it earlier had "granted" what apparently was Lane's request that OCS not be allowed to point to Wilson as responsible for Lane's damages, referring to AS 09.17.080[41] and Alaska Civil Rule 14(c).[42] OCS responded that the situation was not an "apportionment of fault issue" but rather a problem with OCS paying workers' compensation benefits

---

[41]     Alaska Statute 09.17.080(a) and (d) provide that in "actions involving fault of more than one person, including third-party defendants and persons who have settled or otherwise been released" from liability for damages, the jury should be instructed to allocate percentages of fault among those responsible for the resulting harm and judgment should be entered against those responsible based on the fault percentage of the damages determined by the jury. Subsection .080(a)(2) sets out an exception disallowing allocation of fault to a person who was identified as a potentially responsible person and who could have been joined in the action for allocation of fault but was not joined. Subsection .080(c) further provides that judgment shall not be entered against a non-party and that the jury's determination of that non-party's fault is not binding on the non-party.

[42]     Alaska R. Civ. P. 14(c) provides the procedural mechanism for a defendant in an action involving fault to add third-party defendants to the action for the jury's allocation of fault under AS 09.17.080.

to Lane and potentially paying damages to Lane for the same harm. OCS argued that what Wilson did and what OCS did were "two separate claims" and "two separate sets of facts." The court seemed to agree. OCS further argued that it was "not even the same incident" and that Wilson's action's constituted "a completely separate tort claim," referencing *Pouzanova v. Morton*.[43] Discussions stopped at that point due to time constraints.

The next morning the court said that it had reviewed AS 09.17.080, Civil Rule 14(c), and the allegations raised by Lane against OCS. The court said that Wilson could not be an empty chair for Lane's whistleblower claim because "[t]hat's on [OCS]" and that Wilson could not be an empty chair for Lane's wrongful termination claim based on retaliation because "again, that's on [OCS]." The court then said that Lane's claim for breach of the implied covenant of good faith and fair dealing was between "Lane and OCS" and "[Wilson's] actions can't play a role there." Moving to Lane's then-existing IIED claim, the court said that "[Wilson] could, in fact, be a tortfeasor therein" but because Wilson had not been brought in as a party, that there could "be no diminution." The court said: "There could be . . . an absolute negation of liability on IIED, because there is [a jury] instruction that says if you find that the conduct of another is in any way greater than the conduct of [OCS], as the other tortfeasor, then that actually wipes out liability on IIED." The court asked if what it had said was correct.

---

[43]     As further discussed below, *Pouzanova v. Morton*, 327 P.3d 865, 869-70 (Alaska 2014), and *Cooper v. Thompson*, 353 P.3d 782, 789 (Alaska 2015), in essence stand for the proposition that a defendant in a tort lawsuit may point to other independent and unrelated *causes* of the plaintiff's claimed harm for which the defendant should not be liable — in whole or in part — without the defendant having to file a third-party complaint against parties to the independent incident to bring them in for allocation of *fault*.

OCS's attorney responded with a reference to *Pouzanova*. The court said that its review of the case was "not telling me anything that I think I've misconstrued." The court then inquired about OCS not being able to bring Wilson into the case for allocation of fault on the whistleblower claim and the two versions of Lane's wrongful discharge claim; OCS's attorney confirmed the belief that Wilson could not be brought in as a third-party defendant for allocation of fault on those claims. The court said that left the IIED claim, and OCS's attorney responded that because Wilson caused Lane some emotional distress in a separate incident it was a separate cause that the jury should be able to consider "so OCS is not responsible for [Wilson's] actions towards Ms. Lane." The court said it appeared that Wilson's actions "could only negate, because if [the jury] find[s] that he was the cause, then on IIED, you're off the hook."

The court reiterated its position that, although evidence of Wilson's conduct had been presented for limited purposes, the jury could not "ascribe fault to [Wilson]" on the whistleblower and wrongful discharge claims. OCS's attorney agreed. One of Lane's attorneys then stated that emotional distress is a damage element of the whistleblower and wrongful discharge claims and that IIED did not have to be proved "to get emotional distress damages." At that point another of Lane's attorneys suggested the IIED claim might be dismissed to "drop [Wilson] out completely." The court concluded with a ruling that "[Wilson's] actions in no way diminish or negate the conduct of OCS with regard to whistleblower standing alone." But the court also ruled that, for the wrongful termination claims, Wilson's conduct can negate those intertwined elements. The court said the instructions it handed out that morning included its reasoning.

Later, just before and again just after the jury was released for the day, more jury instructions conversation ensued. The court noted that it would give a

"substantial factor" instruction and that the parties could propose one.[44]  And it noted there was an instruction in the packet to the effect of "if you find that the cause of Ms.

---

[44]      Alaska Civil Pattern Jury Instructions 3.07 and 3.08 provide "substantial factor" and "multiple causes" instructions in the negligence context, as follows:

### 03.07  SUBSTANTIAL FACTOR

Negligence is a substantial factor in causing harm if:

(1) the harm would not have occurred without the negligence; and

(2) the negligence was important enough in causing the harm that a reasonable person would hold the negligent person responsible.  The negligence cannot be a remote or trivial factor.

[Number (1) does not apply if two events operated to cause the harm, one because of the defendant's negligence and the other not, and each event by itself was sufficient to cause the harm.]

Directions for Use

This is the general causation instruction for negligence cases.  It includes both fact and legal cause.  The bracketed language should be given if two or more forces are claimed to have operated to bring about the injury, and each of them operating alone is sufficient to cause the injury.

If there is evidence of multiple causes, Instruction 3.08 (Multiple Causes) should also be given.  If there is evidence of superseding cause, Instruction 3.09 (Superseding Cause) should be given.

. . . .

### 03.08  MULTIPLE CAUSES

Several factors may operate at the same time, either independently or together, to cause harm.  In such a case, each may be a substantial factor in causing the harm.  A person's negligence may be a substantial factor in causing the harm even though another condition, event, or the

-23-                                                        7685

Lane's emotional distress was 50[%]-50[%] or greater by [Wilson], you must find for [OCS]." Lane's attorney disapprovingly responded that this instruction "is a big deal" and "what [the] Supreme Court's going to be deciding." Counsel then focused on a draft instruction originally proposed by OCS. OCS argued that Lane had the burden to prove that OCS's conduct caused her to suffer emotional distress, and that OCS had the right to show, in a manner that was "not an apportionment issue at all," that Lane suffered emotional distress caused by something other than OCS's conduct.[45] The court agreed.

---

<div style="margin-left: 2em">

conduct of another person was also a substantial factor in causing the harm.

<div style="text-align:center">Directions for Use</div>

This instruction should be given when there is evidence that more than one factor operated to cause the harm.

</div>

Although these instructions are tailored to a negligence claim, they contextualize the instructions given in this case.

[45] For example, the Alaska Civil Pattern Jury Instructions on superseding cause and aggravation of preexisting conditions are as follows:

<div style="margin-left: 2em">

**3.09    SUPERSEDING CAUSE**

Defendant claims that [he] [she] is not responsible for plaintiff's harm because a later act or event was a superseding cause of the harm.

The later act or event may be a superseding cause if both of the following statements are more likely true than not true:

(1)  the other act or event was outside the scope of the foreseeable risk posed by the defendant's conduct, and had no reasonable connection to it; and

(2)  in hindsight, it is highly extraordinary that the defendant's conduct would bring about the plaintiff's harm.

</div>

On February 24 Lane filed a notice that she was amending her complaint to dismiss her IIED claim. That morning the court and parties discussed the amendment and its effect. The court noted that the amendment "removes the fault portion of the [IIED claim] from further consideration" and then stated that there "cannot be an

---

If you find that both of these statements are true, then you may find that the other act or event was a superseding cause and that the defendant is not responsible for the plaintiff's harm.

### Directions for Use

This instruction should be given immediately following Instruction 3.08 (Multiple Causes) if the facts present an issue of an intervening force which may be a superseding cause.

. . . .

### 20.11 AGGRAVATION OF PRE-EXISTING CONDITION OR DISABILITY

A person who has a condition or disability at the time of an injury cannot recover damages for that condition or disability. However, (he) (she) is entitled to recover damages for an aggravation of such pre-existing condition or disability if the aggravation is the legal result of the injury.

This is true even if the person's condition or disability made (him) (her) more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person probably would not have suffered any substantial injury. In other words, the law provides that a defendant takes the plaintiff as (he) (she) (it) finds (him) (her) (it).

Where a pre-existing condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional damages caused by the aggravation.

### Use Note

This instruction should be used only where a pre-existing condition or disability is alleged.

apportionment question." The court and the parties reconvened on February 27 and discussed *Pouzanova* and how it should apply.

In *Pouzanova* the defendant in a motor vehicle accident lawsuit asserted that at least some of the plaintiff's claimed noneconomic loss, specifically emotional distress and lost enjoyment of life, was caused not by the vehicle accident but rather by domestic violence in her household.[46] The district court ruled that the defendant was not required to assert a third-party claim against the plaintiff's husband for allocation of fault under AS 09.17.080, but the superior court reversed that decision on appeal.[47] We granted a petition for hearing and reversed the superior court's decision.[48] We stated that "joinder is limited to those who are arguably at fault for damages caused by the incident at issue in the action[,]"[49] and that "it is only fault for the incident at issue that is being allocated among potentially responsible parties."[50]

Our subsequent *Cooper* decision involved another motor vehicle accident lawsuit.[51] The defendant in that case contended that some of the plaintiff's claimed damages were caused by a post-accident domestic assault rather than the accident; the superior court excluded evidence of the domestic assault and we reversed that ruling on appeal.[52] The relevant portion of our decision is that defendants do not need to join parties for fault allocation under AS 09.17.080 if their "alleged fault is not related to

---

[46] 327 P.3d at 866-67.

[47] *Id.* at 869.

[48] *Id.* at 866-67, 869-70.

[49] *Id.* at 869.

[50] *Id.* at 870. *Pouzanova* does not express whether the independent and unrelated incident (domestic violence) was before or after the vehicle accident, and, given the way the matter came to us, there was no discussion of a possible claim for aggravation of a pre-existing condition or of a possible superseding cause defense.

[51] 353 P.3d 782, 785 (Alaska 2015).

[52] *Id.* at 787-91.

the incident at issue in the action."[53]  We noted that the superior court did not have the benefit of our *Pouzanova* decision, that the defendant was asserting "some of the plaintiff's claimed damages were due to conduct entirely unrelated to the automobile accident at issue," that "*Pouzanova* controls," and that the superior court had erred by ruling that the evidence was inadmissible due to the defendant's failure to join the alleged assailant in the accident lawsuit.[54]

In the case now before us, the superior court posited that Lane's claims did not involve "apportionment."  The parties agreed that the facts presented at trial suggested multiple causes of harm, and the court and the parties also agreed that *Pouzanova* did not explain what applicable jury instructions would look like.  The following discussions about Instructions B-9, B-10, and B-14 are instructive.[55]

OCS argued for proposed Instruction B-9, which focused on substantial factor causation for Lane's claims for emotional distress and loss of enjoyment of life and, in a long and convoluted final sentence, included language about how to resolve the multiple-cause issue:

> If two events operated to cause the plaintiff's emotional distress and/or loss of enjoyment of life, one because of the defendant's conduct and the other because of [Wilson's] conduct, and each event by itself was sufficient to cause the plaintiff's emotional distress and/or loss of enjoyment of life, then you cannot find that the defendant's conduct was a substantial factor in causing the plaintiff's emotional distress and/or loss of enjoyment of life and must find for the defendant on the plaintiff's claim of non-economic damages

---

[53]  *Id.* at 789.

[54]  *Id.*  In *Cooper* the independent and unrelated incident (domestic violence) was after the vehicle accident.  *See id.* at 787.  But given the way the matter came to us, there was no discussion of a possible superseding cause defense.

[55]  The February 27 on-record discussions were based on the superior court's proposed instructions apparently distributed to the parties on February 26.  There appear to be no substantive differences between the relevant proposed and final instructions.

of emotional distress and/or loss of enjoyment of life and you may not award the plaintiff any damages for emotional distress and/or loss of enjoyment of life.

Lane did not agree with this last sentence of Instruction B-9. Pointing to Pattern Instructions 3.07 and 3.08, regarding "substantial factor" causation and how that works with multiple causes,[56] Lane questioned where the proposed multiple-cause language in Instruction B-9 could be found. OCS argued that Jury Instruction B-9 followed the two pattern instructions. The court said that "I think [Instruction B-9] is the law." And B-9 went to the jury. Neither party asserts to us that Instruction B-9 was erroneous, so its relevance is limited to how it, along with Instruction B-14, fits with the challenged Instruction B-10 in determining whether any error was harmless.[57]

Proposed Instruction B-10, which applied to claims for both economic and noneconomic loss (although Instruction B-9 was stated to apply only to noneconomic loss), was intended by the court to explain that *allocation of fault* was not appropriate in this case:

> You have heard evidence or may hear arguments that others such as [Wilson] should also be held responsible for the plaintiff's economic and non-economic losses or that the defendant's responsibility for the plaintiff's economic and non-economic losses should be less because of the conduct of the others such as [Wilson].
>
> In Alaska, if a defendant seeks to discount their liability for a plaintiff's economic or non-economic loss or thinks another person should share in the fault, they must make that person a party to the lawsuit. The defendant has not made [Wilson], or anyone else, a party. Therefore the

---

[56]   *See supra* note 44 (setting out Alaska Civil Pattern Jury Instructions 3.07 and 3.08).

[57]   *See City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015) (providing that when reviewing claims of error involving jury instructions, "our inquiry focuses upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law").

defendant's liability for any of the plaintiff's economic or non-economic losses cannot be discounted even if you think [Wilson], or another non-party should share responsibility for the plaintiff's loss.

Lane had no objection to the instruction. OCS did, arguing that allocation of fault concepts had no place in the matter and that the proposed instruction was confusing, presumably in light of Instruction B-9. The court ultimately gave the instruction over OCS's objection, stating that the "instruction makes it clear that [the jurors] can't apportion anything to [Wilson]" and that "the jury . . . can't point to [Wilson] and make an independent judgment on their own that they . . . think that [Wilson] is 30[%] responsible, so we're going to discount it."

Instruction B-14 built on Instructions B-9 and B-10, instructing that the jury was "not to decide any claims for damages" arising from Wilson's conduct and that evidence of Wilson's conduct was "admissible only to the extent . . . [it] may be found to be a separate cause of [Lane's] damages":

> You are not to decide any claims for damages that arise from the OCS client's assaultive and threatening behavior towards the plaintiff and the plaintiff's belief that the defendant failed to take appropriate steps to protect the plaintiff's safety. You are not to decide whether the defendant failed to provide a safe workplace.
>
> Evidence of the OCS client's behavior towards the plaintiff and the defendant's response to that behavior is admissible only to the extent the client's behavior may be found to be a separate cause of the plaintiff's damages or to the extent that the client's behavior formed the basis of the plaintiff's workplace safety complaints and the defendant's alleged retaliatory motive.

Neither party objected to this jury instruction, and, again, we consider it only in the context of our evaluation of Instruction B-10.

### 3.     The post-trial motion regarding jury instructions

OCS argued in its new trial motion that AS 09.17.080's allocation of fault concepts did not apply to the case and that it was error to instruct the jury, in Instruction

B-10, that it was not to consider Wilson's actions when determining damages because Wilson was not a party to the case. OCS contended that, as in *Pouzanova* and *Cooper*, OCS was not required to join Wilson as a third-party defendant for allocation of fault, that the jury should have been allowed to consider damages caused by Wilson, and that the jury should have been instructed to not award those damages against OCS (although it also couched this in terms of "a reduction in the damages to account for those harms caused by [Wilson]"). OCS more clearly argued that it was not suggesting "[Wilson] should bear any fault for any alleged retaliation by OCS," but rather that "the jury [should have been] allowed to consider how much of Ms. Lane's alleged losses [we]re attributable to [Wilson's] separate and independent conduct." OCS concluded that because the jury was instructed "not to consider [Wilson's] conduct or reduce Ms. Lane's damages to account for [Wilson's] separate actions when calculating Ms. Lane's damages, there is no way of determining what portion of Ms. Lane's alleged damages are attributable to [Wilson's] actions."

Lane responded by asserting that Wilson's physical assault and related harm were the subject of Lane's workers' compensation claim and not the lawsuit, that she did not claim damages for Wilson's conduct, and that the jury was instructed not to award damages caused by Wilson, citing Instruction B-10. Lane later argued that "Instructions B-10 and B-14 . . . make it clear that the jury cannot discount [Lane's] losses, even if [the jurors] decided [Wilson] caused a portion of [Lane's] damages." Lane also argued — completely contrary to the court's statements during jury instructions discussions about why Wilson could not be joined for allocation of fault with respect to the contract and retaliation claims that went to the jury — that "OCS claims that adding [Wilson] for fault allocation was 'not possible,' but [it] doesn't explain why it was not possible." Lane further stated: "It must be presumed the jury followed [Instruction B-14] and, as instructed, did not award any damages for [Wilson's] conduct." But Lane presumably meant to refer to Instruction B-10. Instruction B-14 says only that the jury was "not to decide any claims for damages that

ar[o]se from [Wilson's]" actions; it does not say that the jury could not award damages against OCS for harm that Wilson caused.

OCS replied that it was unable to bring Wilson in as a third-party defendant for allocation of fault and that it could be found "liable for only the portion of [Lane's] damages for which it is determined to be directly responsible and which do not arise from [Wilson's] assaultive behavior or OCS's response or alleged failure to protect Ms. Lane from that behavior."

### 4.    The order denying the post-trial motion

Notwithstanding the court's statements and rulings during the jury instructions discussions, it took a 180-degree turn and denied OCS's post-trial motion regarding AS 09.17.080 and allocation of fault or damages by ruling as a matter of law that AS 09.17.080 *did* apply because Wilson's conduct and OCS's conduct were "inexplicably [sic] intertwined."  The court stated that because "OCS . . . *argues* that [Wilson] is at fault for Ms. Lane's damages, it is correct for the court to conclude that [Wilson] is '*arguably* at fault for the damages.' "  (Emphases in original.)  Further noting that "there was nothing preventing OCS from joining [Wilson] to the case," the court observed that "OCS was precluded from pointing the finger at [Wilson] and the jury was correct not to attribute any of Ms. Lane's damages to [Wilson]."

### 5.    The arguments on appeal

OCS confusingly argues that the superior court erred by not allowing allocation of fault to Wilson.  This framing of the argument is distinctly different from OCS's approach during jury instructions discussions.  But it is not easy to simply disregard OCS's argument on this basis:  OCS appears to be reacting to the superior court's post-trial ruling that Wilson's conduct and OCS's conduct were one *causation* incident and that the jury could not allocate fault to Wilson because OCS had not brought Wilson into the case as a third party for fault allocation, noting that the court "nevertheless erroneously relied on the connection between Wilson's actions and OCS's later conduct, overlooking that each is a distinct 'incident.' "

OCS's arguments are a mishmash of legal concepts, but we understand its position to be that: under the *Pouzanova*/*Cooper* cases OCS was not required to file a third-party complaint against Wilson and bring him into the lawsuit; OCS was entitled to point to Wilson's conduct as an independent and unrelated cause of damages to Lane that could not be awarded against OCS; this effort to blame Wilson was in reality an allocation of "fault" not for the same incident but rather for a different incident; and Instruction B-10 erroneously instructed the jury that it could not "discount" damages against OCS for Wilson's conduct.

Lane's briefing correctly argues that "OCS confuses the concept of apportionment of fault with the concept of causation of damages." But contrary to its argument to the superior court, Lane states that apportionment of fault would have been legally improper because Wilson's conduct and OCS's conduct were two separate incidents. Lane does not engage with the superior court's post-trial ruling that the conduct really was one incident. Lane concludes that the superior court abided by *Pouzanova* and *Cooper* by not restricting OCS from introducing evidence of Wilson's conduct or arguing that Wilson caused some or all of Lane's damages.

Lane contends that, based on the instructions as a whole, the jury was properly instructed on how to deal with Wilson's conduct. Lane starts out with Instruction B-4, regarding "substantial factor" in causing damages.[58] Lane asserts that the instruction was "standard language" from Pattern Instruction 20.01A (2018) and that OCS did not object to it. Lane appears to be correct as to Instruction B-4 following the pattern instruction, but OCS did object to the instruction. Lane next points to

---

[58] Instruction B-4 provided, in relevant part: "To make an award for a loss claimed by the plaintiff, you must decide that it is more likely true than not true that: (1) the plaintiff had such a loss or is reasonably probable to have such a loss in the future; and (2) the defendant's conduct was a substantial factor in causing the loss."

Instruction B-12 on "legal cause" and notes that this "straightforward instruction" incorporated language proposed by OCS.[59] Lane appears to be correct.

Lane then moves to Instruction B-9, asserting that this instruction "addressed causation again" and told the jury that there should be no award of damages against OCS unless the jury "determined that OCS's conduct was a 'substantial factor' in causing Lane emotional distress." Lane notes that she questioned this instruction during the discussions, but that OCS did not object to it. And OCS does not argue to us that this instruction was erroneous.

Lane then moves to Instruction B-10, identifying it as the one "that OCS challenges." Lane asserts that: the causation instructions "stressed repeatedly" that the jury could award damages against OCS "*only* for losses caused by OCS in the actions that established retaliation or wrongful termination" (emphasis in original); although OCS complains about Instruction B-10, OCS "fails to address the package as a whole" and leaves the wrong impression that the superior court "did nothing to ensure that jurors did not award Lane money for losses caused by Wilson rather than OCS"; and while Instruction B-10 "may be a little confusing and may not have been necessary" it "is legally correct" and the jurors could have asked questions if they were confused.

---

[59] Instruction B-12 provided, in relevant part:

I will now define "legal cause" for you.

A legal cause of harm is an act or failure to act that is a substantial factor in bringing about the harm. An act or failure to act is a substantial factor in bringing about harm if it is more likely true than not true that

  (1) the act or failure to act was so important in bringing about the harm that a reasonable person would regard it as a cause and attach responsibility to it; and

  (2) the harm would not have occurred but for the failure to act.

When questioned at oral argument before us about the superior court's shift in analysis about whether Wilson's conduct and OCS's conduct were a single incident or separate incidents, Lane's attorney responded, contrary to Lane's briefing, that "bluntly the superior court was wrong in its analysis post-trial." But Lane's attorney nonetheless contended that, as a whole, the jury instructions correctly explained how the jury was to calculate damages against OCS.

### 6. Why the superior court's post-trial motion analysis was erroneous

It was error to deny OCS's post-trial motion (as it related to jury instructions) on the stated ground of OCS's alleged failure to bring Wilson into the litigation under AS 09.17.080 to allocate fault for what the superior court referred to as a single incident. It is beyond doubt that the superior court litigation, and particularly the jury instructions discussions, was consistently founded on an agreed understanding by the superior court and the parties that there were two separate, independent causal incidents for at least some of Lane's damages. Both OCS and Lane ultimately agree that there were two separate, independent causal incidents for at least some of Lane's damages and that the superior court erred in its analysis of OCS's post-trial motion.

The superior court's ruling nonetheless might be affirmed if we could conclude that any error in Instruction B-10 was harmless because the jury instructions, as a whole, properly instructed the jury about awarding Lane only those damages caused by OCS. But, as set forth in the next sections, we conclude that Instruction B-10 was erroneous and that, at least with respect to noneconomic damages, the related instructions (and other relevant instructions not discussed by the parties) did not render that error harmless.

### 7. Why the jury instruction was erroneous

As OCS correctly argued to the superior court, Instruction B-10 had no application to this case. It was wrong, not just confusing. *Allocation of fault* to determine OCS's and any others' individual, comparative responsibility for Lane's

indivisible damages was not needed because no one but OCS was involved in the employment-related incident between OCS and Lane. What was needed was an instruction about *allocation of divisible damages* between one incident — Wilson's physical assaults on Lane — and another, separate incident — OCS's wrongful retaliation against and constructive discharge of Lane — because the court and the parties had agreed that they were independent, separate causes of at least some of the damages to Lane. There is a significant difference between allocating divisible damages among multiple causal incidents and allocating indivisible damages for each separate incident among multiple parties based on comparative fault.[60]

The Restatement (Third) of Torts: Apportionment of Liability § 26 (Apportionment of Liability When Damages Can Be Divided by Causation) provides:

> (a) When damages for an injury can be divided by causation, the factfinder first divides them into their indivisible component parts and separately apportions liability for each indivisible component part under [relevant rules for apportionment].
>
> (b) Damages can be divided by causation when the evidence provides a reasonable basis for the factfinder to determine:
>
>> (1) that any legally culpable conduct of a party or other relevant person to whom the factfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks recovery and
>>
>> (2) the amount of damages separately caused by that conduct.
>
> Otherwise, the damages are indivisible and thus the injury is indivisible. Liability for an indivisible injury is apportioned under [relevant rules for apportionment].

---

[60] *See generally* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB., Topics 1 (Basic Rules of Comparative Responsibility), 2 (Liability of Multiple Tortfeasors for Indivisible Harm), and 5 (Apportionment of Liability When Damages Can Be Divided by Causation) (AM. L. INST. 2000).

The Restatement describes a two-step process. The first step is dividing damages by causation into indivisible parts that each represent a single legal cause.[61] Second, considering each indivisible part separately, the factfinder may apportion liability.[62] The Restatement notes a relative dearth of cases in which both steps apply,[63] but strong reasoning supports the two-step division:

> The policies underlying division by causation and apportionment by responsibility suggest solutions to these issues. No party should be liable for harm it did not cause, and an injury caused by two or more persons should be apportioned according to their respective shares of comparative responsibility. Sometimes these policies converge, but sometimes they conflict. They must be tempered with two additional considerations. A working system must be capable of being understood and applied by courts and juries in a reasonably efficient manner, and available evidence sometimes leaves uncertainty that the legal regime must accommodate.[64]

The primary jury instructions incorrectly conflated the steps. The parties and the court had agreed that Wilson's assault and OCS's retaliation were separate

---

[61]     *Id.* § 26 cmt. a, *Scope* ("Damages can be divided by causation when any person or group of persons to whom the factfinder assigns a portion of responsibility (or any tortious act of such a person) was a legal cause of less than the entire damages. . . . Divisible damages are first divided by causation into indivisible parts, and then each indivisible part is apportioned by responsibility.").

[62]     *Id.* § 26 cmt. c, *Employing the two-step process in Subsection (a)* ("For each indivisible component part, the factfinder assigns a percentage of comparative responsibility to each party or other relevant person. . . . The percentages of comparative responsibility for each component part add to 100 percent. . . . The other rules [regarding apportionment] are applied to each component part as though the suit involved that part alone.").

[63]     *Id.* § 26 cmt. a ("Dividing damages by causation and apportioning liability by responsibility in the same case has not been widely addressed by statute or case law.").

[64]     *Id.*

independent causes, which should have clarified the first step. But the jury instructions failed to delineate between the first step of separating damages by cause and the second step of allocating fault for each causal category of damages. The record reflects that prior to the jury instructions discussions some evidence had been presented at trial about the differences and relationship between Lane's noneconomic damages arising from the separate incidents. Some expert witness evidence (apparently from Lane's workers' compensation claim proceedings) divided Lane's noneconomic loss into separate components for Wilson's conduct and OCS's conduct, but after the court and parties referred to this as "allocation of fault" evidence, OCS agreed not to rely on it for the balance of the trial.

The instructions themselves further demonstrate the erroneous conflation. If the jury instructions had correctly distinguished between the two steps, another jury instruction would have had to have been issued. A Restatement comment states:

> Whether damages can be divided by causation is a question of fact. The fact that the magnitude of each indivisible component cannot be determined with precision does not mean that the damages are indivisible. All that is required is a reasonable basis for dividing the damages.[65]

Therefore, if it were disputed whether Lane's damages were divisible by causation, there should have been a jury instruction on the issue.

This analysis fits a case falling within the *Pouzanova*/*Cooper* context.[66] The correct analysis and directive to the jury throughout the relevant jury instructions

---

[65]    *Id.* § 26 cmt. f, *Divisible damages*; *see also id.* § 26 cmt. h, *Burden of proof and sufficiency of evidence to permit damages to be divided by causation* (noting "this Comment places the burden to prove the magnitude of divisible damages on the party who seeks to avoid responsibility for the entire damages").

[66]    Other states' cases citing the Restatement (Third) of Torts: Apportionment of Liability § 26 describe similar contexts, such as when "the original injury and the subsequent enhancement of that injury [are] separate and causally-

should have been that the jury could not award Lane any damages against OCS for losses caused by Wilson's separate, independent conduct, that the jury should first determine the separate amounts of Lane's damages caused by Wilson and OCS, and that the jury then should award Lane only those damages caused by OCS.[67]

As delivered, the jury instructions probably affected the jurors' judgment about awarding damages against OCS even for some harms that the jury might otherwise have determined Wilson had caused. Lane suggests throughout her briefing that Instruction B-10, along with Instructions B-9 and B-14, collectively express the basic concept that the jury could award Lane only those damages caused by OCS. But Instruction B-10 expresses an entirely different concept: that because OCS did not make Wilson a party to the lawsuit, OCS's "liability for *any* of the plaintiff's economic

---

distinct injuries." *Payne v. Hall*, 137 P.3d 599, 604 (N.M. 2006) (emphasis omitted) (quoting *Lujan v. Healthsouth Rehab. Corp.*, 902 P.2d 1025, 1029 (N.M. 1995)) (applying "successive tortfeasor liability" to the "narrow class of cases" where "a plaintiff can show more than one distinct injury successively caused by more than one tortfeasor"); *see also, e.g.*, *Auten v. Franklin*, 942 N.E.2d 500, 511-12 (Ill. App. 2010) (applying "two-step process, dividing injuries by causation and then apportioning responsibility" and finding that injuries to two separate body parts, only one of which included alleged successive claim of medical malpractice, were two separate and distinct injuries); *Henry v. Superior Ct.*, 72 Cal. Rptr. 3d 808, 817 n.9 (Cal. App. 2008) (explaining that if "separate torts caused injuries that can be divided by causation . . . then only the liability for the enhanced or aggravated injury is properly apportioned on the basis of their comparative fault").

[67]     *Cf. Said v. Assaad*, 735 N.Y.S. 2d 265, 268 (N.Y. App. Div. 2001) ("Commentators that have considered this [damages apportionment] issue have recommended or noted that joint and several liability should not be imposed whenever injuries are *separate and distinct and may be differentiated with respect to their causation*." (emphasis added)); *see also id.* at 268-69 (citing and relying upon RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 26 (AM. L. INST. 2000)).

or noneconomic losses cannot be discounted even if you think [Wilson] should share responsibility for the plaintiff's loss." (Emphasis added.)

Suppose the jury had determined that Lane suffered $1 million in damages. And suppose at the first step it determined that Lane suffered two divisible harms: one by Wilson's assaults, which caused 10% of her total harm, and one by OCS's retaliation, which caused 90% of her total harm. Under the correct two-step analysis, OCS would be responsible for up to $900,000. There would have been no need to focus on step two allocation of fault for the $900,000 in damages because no one but OCS was involved in causing those damages. The jury then would have awarded Lane $900,000 in damages against OCS. But without an instruction clearly separating the two-step analysis, reading Instruction B-10 could lead the jury to erroneously award 100% of the damages against OCS even if it found OCS's retaliation caused only 90% of those damages. The instruction told the jury to avoid "discounting" OCS's liability for "any" of Lane's losses because Wilson was not a party.

Instruction B-9 does not ameliorate Instruction B-10's error. Instruction B-9, which relates solely to noneconomic damages, also is inconsistent with what a jury must determine in the *Pouzanova/Cooper* context. It states that if the jury determined Wilson was a substantial factor in causing Lane emotional distress or loss of enjoyment of life, *no* award for noneconomic loss could be made against OCS even if OCS's conduct also was a substantial factor in causing emotional distress and loss of enjoyment of life. Contrary to the notion of dividing damages by causal incident, Instructions B-9 and B-10 together presented an all or nothing decision for the jury based on the assumption that all of Lane's emotional distress was one indivisible injury with only one possible substantial factor as the cause. This was consistent with the superior court's statements during jury instructions discussions that Wilson's conduct could only "negate" OCS's liability for damages. But this only exacerbated the error

in Instruction B-10 because the *Pouzanova/Cooper* context ultimately requires the division of damages by causation.[68]

And Instruction B-14 is no help. It says that the jury is not to decide "any claims for damages" that arose from Wilson's conduct. Yet it then says the evidence the jury heard about Wilson's conduct was "admissible only to the extent [Wilson's] behavior may be found to be a separate cause of plaintiff's damages." How could the jury determine whether Wilson's conduct caused separate damages to Lane that could not be awarded against OCS, and the amounts of the damages caused separately by Wilson and OCS, if it was instructed not to decide any claimed damages?

We, like other courts, recognize that some confusion is likely to arise when discussing the distinction between fault and causation in the context of allocation of damages.[69] An Illinois appellate court has noted that courts have difficulty when discussing the distinction, but "[e]ven where the magnitude of each indivisible component cannot be determined with precision, this does not mean the damages are

---

**68**    *Cooper v. Thompson*, 353 P.3d 782, 789 (Alaska 2015).

**69**    *See Glassman v. Friedel*, 265 A.3d 84, 104 (N.J. 2021) (recognizing that "two-stage apportionment process for successive tortfeasors [under Restatement (Third) of Torts: Apportionment of Liability § 26] is more complex than the familiar procedure conducted in joint-tortfeasor cases involving settling defendants" and "require[s] careful oversight by our skilled and seasoned civil trial courts"); *City of Chicago v. M/V MORGAN*, 248 F. Supp. 2d 759, 775 (N.D. Ill. 2003), *aff'd*, 375 F.3d 563 (7th Cir. 2004) (asking whether "the 'fault' that is to be apportioned or compared [includes] culpability only or causation as well," and concluding allocation of property damages from maritime collision "includes apportioning causation as well as culpability"); *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1139 (9th Cir. 1977) ("When we find that the 'fault' of each party will be compared, what we mean by 'fault' is that party's blameworthy conduct which contributes to the proximate cause of the loss or injury. . . . We do note in passing that perhaps the term '*comparative causation*' . . . is a conceptually more precise term than 'comparative fault' since fault alone without causation does not subject one to liability." (emphasis added)).

indivisible. All that is required is a reasonable basis for division of the damages."[70] Whether damages can be divided by causation is thus generally a question of fact,[71] properly queried to the factfinder at the conclusion of the trial.[72]

### 8. Harmless error analysis

Lane sought three categories of damages at trial: (1) past and future wage and benefit loss (with the future wage and benefit loss also referred to as future earning capacity loss), (2) past and future counseling expenses, and (3) past and future noneconomic loss for emotional distress and/or loss of enjoyment of life. The analysis to determine whether the erroneous Instruction B-10 was harmless error necessitates considering additional jury instructions on how to calculate these damages items.

The jury instructions for the two economic loss categories make clear that, to the extent the jury might award damages, past damages were to be calculated for the time period from Lane's employment termination to the trial, and future damages were to be calculated for the time period after trial into the future. The jury instruction for Lane's noneconomic loss damages simply referred to past and future noneconomic loss "resulting from the injury," but did not identify a date or specific "injury." The Special

---

[70]     *Auten*, 942 N.E.2d at 512 (citing RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 26 cmt. f, *Divisible damages* (AM. L. INST. 2000)).

[71]     RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 26 cmt. f, *Divisible damages* (AM. L. INST. 2000).

[72]     *Cf. Payne v. Hall*, 137 P.3d 599, 608 (N.M. 2006) (reversing and remanding for new trial, holding that trial court's improper instructions presented jury with wrong question, causation for whole injuries, and never asked determinative question, "whether the [first defendant's] negligence caused a discrete injury, separate from injuries inflicted [by the second defendant]"); *Lackey v. Mays*, 286 S.W.3d 193, 198 (Ark. App. 2008) (affirming trial court determination that plaintiff's injuries from two different accidents were separate and distinct because plaintiff "had nearly recovered from his first accident before the second accident" and plaintiff's "pain level just before the second accident was actually less than it had been before the first accident").

Verdict form thus asked the jury to calculate five items of damages if the jury found OCS liable to Lane for wrongful employment termination. And after finding OCS liable, the jury found Lane had $239,148 in past wage and benefit loss since her employment termination; $1,403,037 in future lost earning capacity; $20,438 in past counseling expenses since her employment termination; $90,000 in future counseling expenses; and $550,000 for past and future emotional distress and/or loss of enjoyment of life.

### a. Why the jury instruction error regarding the award for economic loss was harmless

We are not persuaded that the erroneous Instruction B-10 substantially prejudiced OCS with respect to the jury's award of past and future economic loss for OCS's wrongful termination of Lane's employment. OCS consistently conceded throughout the jury instruction discussions that Wilson could not be at fault or liable for damages attributable to Lane's employment termination.[73] The jury instructions about calculating economic damages expressly limited an award to damages occurring from Lane's employment termination to trial and from trial forward. The jury found that OCS wrongfully terminated Lane's employment and awarded her past and future economic damages facially consistent with those jury instructions.

OCS also conceded in its motion for a new trial that Wilson should not be liable for damages attributable to OCS's termination of Lane's employment. But OCS essentially argued that Lane's economic damages were rooted in Wilson's misconduct and her emotional distress arising therefrom — emotional distress that, OCS argued, led to Lane being unable to work. The superior court rejected that argument, stating: "Contrary to OCS's assertion, the substance of Ms. Lane's claims arise not from her assault at the hands of [Wilson,] but instead from OCS's response to that assault."

---

[73] *See supra* Section III.B.2. (outlining jury instruction discussions during trial).

OCS argues to us that Lane's wage loss was "caused by PTSD that apparently rendered her unable to work" and that because Wilson had a role in causing Lane's PTSD, OCS was held liable for damages caused by Wilson. But the jury found OCS's wrongful employment actions toward Lane were such that a reasonable person would have felt compelled to resign her employment.[74] Lane was able to return to work with whatever emotional distress had been caused by Wilson; it was OCS's wrongful retaliatory conduct that caused Lane to resign her position, not emotional distress associated with Wilson's prior conduct.

Lane's wrongful discharge claim accrued when her employment terminated. When determining the resulting economic loss, the jury was entitled to take into account Lane's mental state at the time of her termination through trial and from trial forward, without regard to the underlying causes of her mental state.[75] In short,

---

[74] *See supra* Section III.A.3. (discussing objective standard set out in jury instruction regarding wrongful constructive discharge).

[75] *See Brandner v. Hudson*, 171 P.3d 83, 88 (Alaska 2007) (noting "trial court properly recognized that whether [plaintiff's] reaction was unusual was not relevant to the issue of damages" and concluding that, even when plaintiff's "injury may have been unusual or unpredictable, [defendant] is nonetheless liable for all injuries that were either caused or aggravated by [defendant's] actions"); *Glamann v. Kirk*, 29 P.3d 255, 261 (Alaska 2001) (recognizing well-established principle that "defendant must take the victim as the defendant finds the victim and is liable for those injuries caused or aggravated by defendant's negligence"). The relevant jury instruction for future wage and benefit loss in this case, which OCS does not challenge, reads, in part:

> To calculate this amount, you must determine the difference between the plaintiff's ability to earn money before the [termination] and her ability to earn money after the [termination]. To do this you may consider the plaintiff's health [and] physical and mental abilities; her work habits and occupation before the accident; the nature and extent of

Wilson could not have been at fault for Lane's wrongful termination or for the economic loss resulting from that wrongful termination. As the superior court correctly noted during the jury instructions, "that's on [OCS]."

Accordingly, notwithstanding our conclusion that Instruction B-10, coupled with Instructions B-9 and B-14, was erroneous, there is no basis for us to conclude that Instruction B-10 caused OCS substantial prejudice with respect to the jury's award of economic loss damages. Given the specific jury instructions on considering and calculating economic losses flowing from a finding that OCS wrongfully terminated Lane's employment — which was the *only* relevant incident causing Lane's economic losses — we conclude that the erroneous language of Instruction B-10 did not probably affect the jury's judgment as to the economic loss awards.

###### b. Why the jury instruction error regarding noneconomic loss was not harmless

Our conclusion with respect to noneconomic loss damages (i.e., emotional distress and loss of enjoyment of life) is to the contrary. Lane's requests for economic damages focused on the specific injury of wrongful discharge. In contrast, Lane's request for emotional distress damages was not obviously so narrowly focused; OCS's wrongful retaliation occurred during Lane's employment, which occurred prior to, and led to, the wrongful termination. Unlike the wrongful termination claim and associated economic loss, it is indisputable that there were two separate incidents during Lane's employment that caused her to suffer emotional distress — Wilson's assaults and

---

her injuries; and how long and to what extent her injuries
will affect her earning ability in the future.

OCS's wrongful retaliation/termination after Wilson's assaults. The separate jury instruction on noneconomic loss reads, in part:

> One of the losses claimed by the plaintiff is for non-economic loss. You may award the plaintiff a fair amount to compensate the plaintiff for emotional distress and/or loss of enjoyment of life resulting from the injury.
>
> Such an award should fairly compensate the plaintiff for the non-economic losses she has experienced from the date of the injury until the date of trial and for non-economic losses that she is reasonably probable to experience in the future.

Unlike the jury instruction for wage and benefit loss, the jury instruction does not describe the "injury" for purposes of awarding noneconomic loss damages. Unlike the jury instructions on wage and benefit loss and counseling expenses, the jury instruction does not state that it is limited to noneconomic loss damages associated with the wrongful employment termination or state a limitation to damages arising after Lane's employment termination.

The Special Verdict form comes close to closing this hole in the jury instruction on noneconomic loss damages, stating:

> If you find in favor of the plaintiff on constructive discharge by subjective breach of the implied promise of good faith and fair dealing, retaliation, and/or Whistleblower Act claim, then you must decide the value of the non-economic damages the plaintiff incurred for her emotional distress and/or loss of enjoyment of life.

But although it seems to condition an award of emotional distress damages on a finding that Lane was wrongfully terminated, it does not limit an award of damages to the wrongful termination of Lane's employment. Instruction B-10 (along with Instructions B-9 and 14) thus was the only attempt to explain that the jury was to award noneconomic damages only for OCS's conduct and not for Wilson's conduct. But as we explained above, that attempt was flawed.

It is clear from the jury instructions discussions and OCS's motion for a new trial that the focal point for a *Pouzanova/Cooper* jury instruction was Lane's

request for noneconomic loss damages for emotional distress. Unlike with Lane's request for economic loss damages, there were two separate underlying incidents injuring Lane from an emotional distress standpoint. The error in Instruction B-10 thus had a different impact on the jury's evaluation of Lane's noneconomic damages than it did on its evaluation of Lane's economic damages. We conclude that erroneous Instruction B-10, particularly when coupled with Instructions B-9 and B-14, probably affected the jury's judgment and may have substantially and adversely influenced the noneconomic damages award. We therefore reverse in part the superior court's denial of OCS's post-trial motion on the jury instruction issue, vacate the judgment as to noneconomic damages, and remand for a new trial to determine noneconomic damages as outlined above.

### C. We Remand For Further Proceedings On OCS's Post-Trial Assertion That The Economic Damages Award Duplicates Workers' Compensation Benefits.

OCS's post-trial motion included a request that, if the superior court did not set aside the jury's damages awards based on the exclusive liability provision of the Alaska Workers' Compensation Act, it should at least reduce Lane's wage and benefits damages awards to offset duplicative disability workers' compensation benefits paid or payable paid to Lane.[76] OCS asserted, without any evidentiary support, that Lane had received around $115,000 in workers' compensation benefits for lost wages from the time of her employment termination through trial. OCS argued that it then was impossible to determine the amount of additional lost wages and benefits Lane would receive from trial forward because Lane's workers' compensation claim had not been resolved. Lane's short response was that there could be an offset only for periods of time when workers' compensation benefits overlapped a damages award and this did

---

[76] *See supra* note 2 (discussing primary workers' compensation issues relevant to Lane's claims).

not happen in her case. Lane further claimed that "[n]o [workers' compensation] payment would preclude an award of benefits related to [her] employment, i.e., pension, vacation, comp time, etc., which [the expert] separated out from lost wages." She also argued that the superior court could not implement an offset and that only the Alaska Workers' Compensation Board could effectuate an offset against future benefits for damages Lane might receive.

The superior court ruled that, as a matter of law (but without citing any supporting authority), Lane could receive past wage and benefit loss damages that duplicated her workers' compensation disability payments because OCS's violation of the Alaska Whistleblower Act constituted an intentional tort.[77] It followed up with additional analysis that because (1) workers' compensation is "funded by contributions from a worker's paycheck[,]" and (2) intentional torts take a claim out from the exclusive liability provision of the workers' compensation system, it would be inequitable for the court to reduce Lane's damages to avoid duplicative payments (although perhaps Lane might owe some of her recovery to the workers' compensation fund, not to OCS). Finally, the court ruled that, to the extent OCS was seeking reduction of Lane's damages under the statutory collateral source rule,[78] OCS had failed to present any actual evidence of workers' compensation payments made to Lane.

The superior court's analysis was incorrect. First, although an employee may sue an employer for an intentional tort and avoid the exclusive liability provision

---

[77]    *See supra* note 2 (discussing primary workers' compensation issues relevant to Lane's claims).

[78]    *See* AS 09.17.070(a) ("After the fact finder has rendered an award to a claimant, and after the court has awarded costs and attorney fees, a defendant may introduce evidence of amounts received or to be received by the claimant as compensation for the same injury from collateral sources that do not have a right of subrogation by law or contract."). We note that a workers' compensation statute expressly grants subrogation rights to an employer for benefits paid as a result of a third party's conduct. *See* AS 23.30.015.

of the workers' compensation system, that does not allow the employee to obtain a double recovery of both workers' compensation benefits and common law damages from the employer for the same injury, and we are unaware of any Alaska authority to the contrary.[79] Second, employers, not employees, generally are responsible for providing workers' compensation protection for employees.[80] There is no evidence in the record suggesting that Lane somehow funded her workers' compensation coverage from OCS through payroll deductions. Finally, OCS conceded it was not seeking relief under the collateral source statute and it seems clear the statute would have no application to this case.[81]

The little information in the record about Lane's workers' compensation claim arising from Wilson's assaults reflects that her claim was unresolved at the time of trial and that she was seeking medical, disability, and re-employment benefits. Because evidence of Lane's workers' compensation benefits was excluded at the jury trial, it is entirely unclear from this record whether Lane has received, or may receive, workers' compensation benefits that actually do or would overlap and duplicate any

---

[79] *Compare VECO, Inc. v. Rosebrock*, 970 P.2d 906, 917 (Alaska 1999) (recognizing "[i]t would be inconsistent with the legislative purpose of affording complete relief to those injured by discrimination to hold that nonduplicative damages are barred by the exclusive remedy provision of the Workers' Compensation Act"), *and Cameron v. Beard*, 864 P.2d 538, 546-47 (Alaska 1993) (emphasizing "employee is not entitled to recover lost wages in a breach of contract action for any period of time that the employee was disabled and received compensation benefits for the disability"), *with Exxon Corp. v. Alvey*, 690 P.2d 733, 743-44 (Alaska 1984) ("Under the Alaska Workers' Compensation Act, when an employee recovers damages from a third party, the employer is entitled to be reimbursed for workers' compensation payments paid by the employer." (citing AS 23.30.015(g)).

[80] AS 23.30.045(a) ("An employer is liable for and shall secure the payment to employees of the compensation payable under [the Alaska Workers' Compensation Act]."); AS 23.30.075(a) (providing that employer must maintain workers' compensation insurance or pay benefits directly).

[81] *See* AS 09.17.070(a); *see also supra* note 78.

part of the jury's economic damages awards. But we have noted in the past that workers' compensation disability benefits are tied to earning capacity,[82] and it is undisputed that Lane was seeking workers' compensation disability benefits and at the same time received substantial jury awards for past wage and benefits losses and future lost earning capacity. We therefore remand this issue to the superior court to allow OCS the opportunity for an evidentiary hearing to prove that the jury award has created or will create an impermissible duplication of damages.[83]

## IV.    CONCLUSION

For the reasons set forth above, we AFFIRM the superior court's denial of OCS's post-trial motion as it related to the jury's liability determination, but we VACATE the superior court's damages judgment and REMAND for further proceedings as outlined above.

---

[82]    *See Unisea, Inc. v. Morales de Lopez*, 435 P.3d 961, 973 (Alaska 2019) (comparing impairment benefits not tied to earning capacity with disability benefits tied to earning capacity).

[83]    This does not suggest that the superior court has jurisdiction to alter workers' compensation awards to Lane.

CARNEY, Justice, dissenting in part.

I agree with almost all of the court's decision today. I disagree only with its conclusion that the award of noneconomic damages must be vacated and remanded based on the erroneous jury instruction B-10.

Like the court, I agree that B-10 is erroneous as well as unorthodox. And I agree that the superior court's "180-degree turn"[1] is as bewildering as it is incorrect. I also agree with the court's characterization of OCS's arguments in its post-trial motion and on appeal as confusing and a "mishmash."[2]

But I part ways with the court over the award of noneconomic damages; I would affirm it. The court contrasts B-8 with the instructions relating to Lane's claim for economic damages. It concludes that the damages must be vacated because there is no statement in the un-appealed instruction B-8 that noneconomic damages may only be awarded in connection with Lane's wrongful termination.[3] But Lane's claims for economic damages required compensation for specific, clearly quantifiable losses: her past and future wages and benefits. Lane's claim for noneconomic damages — emotional distress and loss of enjoyment of life — were by their nature more amorphous.

When we consider jury instructions on appeal we "focus[] upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law."[4] An error in jury instructions is only grounds for reversal if it "caused prejudice."[5]

---

[1]   Opinion at 31.

[2]   Opinion at 32-33.

[3]   Opinion at 46.

[4]   *Thompson v. Cooper,* 290 P.3d 393, 398 (Alaska 2012).

[5]   *Id.* at 398-99.

To evaluate whether there was prejudicial error, "we put ourselves in the position of the jurors and 'determine whether the error probably affected their judgment.' "[6]

In contrast to OCS's post-trial arguments, its position through the end of the nine-day trial was consistent: it had done nothing to cause injury of any kind to Lane and therefore could not be liable for any damages. It denied that she had PTSD, it denied that it had retaliated against her or in any way played a role in her resignation, and it blamed any and all injury that Lane could have suffered on Wilson.

After nearly two weeks of trial, jurors were aware of each side's position. And after several rounds of argument, the parties and the court had reached consensus that *Pouzanova* controlled and that apportionment of fault was not before the jury.[7] It was only B-10, to which OCS correctly objected because it departed from the consensus based on *Pouzanova* that apportionment of fault was not at issue, that risked leading the jury astray from its understanding.[8]

But we must look at that instruction in connection with all the instructions given throughout the lengthy trial and against the backdrop of the parties' evidence supporting their consistently opposing positions. While I would agree that the introduction of B-10 might have risked misleading the jury, I cannot agree that it "probably affected their judgment"[9] when considered in the context of this complex case. I therefore respectfully dissent from this aspect of today's decision.

---

**6**      *Id.* at 399 (quoting *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002)).

**7**      *See* Opinion at 30.

**8**      *See* Opinion at 31.

**9**      *Thompson*, 290 P.3d at 399 (quoting *Reich*, 56 P.3d at 25).